UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HAROLD BURTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CASE NO. 1:95-cv-1054-DFH-TAB |
| v. | ) | |
| | ) | |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW
OR IN THE ALTERNATIVE FOR A NEW TRIAL

Plaintiffs were employed at the Allison Engine division of General Motors. All worked in hourly, union-protected positions and were recruited by General Motors to take jobs as first-line supervisors. Plaintiffs have proved that General Motors promised them that if they gave up their hourly unionized positions, they could return to the hourly work force at any time, upon their request. In the fall of 1993, the Allison Engine plant was rife with speculation about a possible sale of the division. The plaintiffs allege that they asked to return to positions in the bargaining unit prior to the sale. On December 1, 1993, the Allison Engine division was sold to a private equity investment firm and was renamed the Allison Engine Company. The business was subsequently sold to Rolls-Royce. The plaintiffs were never permitted to return to positions in the bargaining unit.

After many years of litigation, the plaintiffs filed a Sixth Amended Complaint that included claims against General Motors for promissory estoppel and fraud. The claims of five plaintiffs – Judith Inman Crawley, Harold Hamilton, Donald Kappel, Donald Livengood, and Roberta Stuart – were tried to a jury in January 2008, with the expectation that the other plaintiffs' claims will be tried (or perhaps settled) after that test trial.  The jury found that the plaintiffs had proved their promissory estoppel claims but not their fraud claims.  The jury awarded the five plaintiffs individual amounts totaling $3.1 million.  General Motors has moved for judgment as a matter of law, arguing that multiple errors were made with regard to the plaintiffs' promissory estoppel claims and asserting that the jury's award of damages was improper.   General Motors also seeks a new trial on those grounds and argues that plaintiffs' closing argument was unfairly prejudicial.  For the reasons discussed below, the court denies General Motors' motion for judgment as a matter of law and for a new trial.

*Procedural History*

Plaintiffs filed their initial complaint on July 3, 1995 in state court.  The defendants removed, arguing that the plaintiffs' state law claims were preempted by § 301 of the federal Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and that the federal court had subject matter jurisdiction over the claims based on federal question jurisdiction.  Plaintiffs moved to remand the case back to state court on November 20, 1995.

Pursuant to 28 U.S.C. § 636(c), the parties consented to trial of the matter by Magistrate Judge John P. Godich and authorized him to conduct any and all proceedings.    Docket Nos. 82, 84.   Judge Godich denied plaintiffs' motion to remand the case to state court.  General Motors moved for summary judgment on May 27, 1997, arguing that plaintiffs' state law claims were preempted by § 301 of the LMRA, that they were barred by the statute of limitations, and that they should be dismissed for a variety of additional reasons.

On April 26, 1998, Judge Godich issued an Order on the Motion for Summary Judgment.  Docket No. 172.  Judge Godich found that the plaintiffs' claims were preempted by § 301 of the LMRA.  He reasoned that each of the state law claims required proof of damages as an element of the claim and that interpretation of the collective bargaining agreement between General Motors and the International Unions, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") would be necessary to determine whether the plaintiffs had proved the elements of the claim, not just to calculate the amount of the damages.  Judge Godich pointed to specific documents that would be important in determining whether there were damages:  paragraph 69 of the October 24, 1993 collective bargaining agreement between General Motors and the UAW, and "Document 86."  Paragraph 69 applied to an employee who previously worked in the bargaining unit and then transferred to a supervisory position and had an unbroken record of employment at General Motors.  If such an employee transferred from a supervisory position to a job in the bargaining unit, the

employee would be credited with the seniority that the employee had established in the bargaining unit, except as provided in Document 86. Paragraph 69 stated:

> Such employee may be placed on a job in accordance with the provisions of the local seniority agreement, beginning with the last previous job the employee held in the bargaining unit; provided however, that if such last previously held job is no longer in existence, the employee may be placed in accordance with Paragraph (59). In no event shall such employee be transferred to a bargaining unit job at a time when the employee has insufficient seniority to be so placed.

Document 86 is a letter from Gerald Knechtel, Vice President at General Motors and negotiator with the UAW, to Stephen P. Yokich, Vice President and Director at General Motors, confirming an agreement that General Motors reached with the UAW. In the event of the transfer of an employee from the bargaining unit to a supervisory position, an employee with seniority would be recalled from layoff status. In addition, Document 86 provided that the transfer of the employee from a supervisory position back to the bargaining unit would not result in the layoff of the "seniority employee" who had been recalled. Judge Godich wrote:

> [R]esolution of [the plaintiffs'] claims would require not only interpretation of the portions of the collective bargaining agreements defining rights and benefits as pertaining to each Plaintiff, but additionally would require an interpretation of Doc. No. 86 and Paragraph 69 of the GM-UAW Agreement to determine whether under the GM-UAW agreement each Plaintiff could be transferred back to a bargaining unit job, if so what bargaining unit jobs they would be eligible to be placed into, and an assessment of the seniority to be credited to each returning Plaintiff.

Docket No. 172 at 24-25. Thus, the plaintiffs' claims were preempted by § 301 of the LMRA. Judge Godich dismissed the plaintiffs' claims for failure to exhaust the

union's grievance and arbitration procedures as required under § 301 of the

LMRA.[1]

_____

[1]Judge Godich also held that the statute of limitations for plaintiffs' claims was two years.  Docket No. 172 at 35.  In *United Auto Workers v. Hoosier Cardinal Co.*, 383 U.S. 696, 704-05 (1966), the Supreme Court held that courts should apply the most analogous state limitations period for claims brought under a federal statute, such as the LMRA, in which Congress has not included a uniform limitations provision.  In *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151 (1983), the Court announced an exception to the *Hoosier Cardinal* rule for "hybrid" claims brought under § 301 by employees against an employer and a union.  A "hybrid" claim combines a claim against the employer for breach of the collective bargaining agreement and a claim against the union for breach of its duty of fair representation based on its decision to uphold the employer's actions in the arbitration process required by the collective bargaining agreement.  The Court held that the six month statute of limitations from § 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), applied to hybrid claims.  The Court found that there was no clear analogy to a hybrid claim in state law.  *Id.* at 165.  Instead, the interests at stake in a hybrid claim were very similar to the interests Congress sought to balance when it enacted the NLRA.  *Id.* at 170.

In *Hawkins v. General Motors Corp.*, 2003 WL 25534493 (S.D. Ind. July 9, 2003), Judge Tinder held that the six month statute of limitations from the NLRA applied to bar the claims of a plaintiff alleging claims very similar to those at issue here.  The court respectfully disagrees with the *Hawkins* conclusion that the claims are hybrid claims subject to the six month statute of limitations simply because the union was a defendant and the collective bargaining agreement includes a grievance procedure.  Here, the plaintiffs initially named the union as a defendant because they sought reinstatement in the union, not because they had alleged the union breached any duty it had to them.  The plaintiffs were no longer members of the union.  It is clear beyond dispute that these plaintiffs could not have used the grievance and arbitration process established in the collective bargaining agreements to address their claims against General Motors, and they certainly had no claim for breach of the duty of fair representation.  Therefore, neither the rule nor the rationale of the special six-month statute of limitations developed in *DelCostello* for hybrid claims against both employers and unions applies here.  See 462 U.S. at 169-72 (explaining unique features of hybrid claims under § 301 to support borrowing six month limitation period for filing unfair labor practice charges); *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1216 (6th Cir. 1987) ("federal courts may still resort to the most analogous state statute of limitations where, as here, the action does not implicate the breach of the union's duty of fair representation").  The plaintiffs in this case have dismissed their claims against the union and never claimed that the union had wronged them in

(continued...)

Plaintiffs filed their Sixth Amended Complaint on October 30, 2002, reasserting some of the claims they had asserted in previous complaints and alleging that any attempts to utilize union grievance procedures would have been futile because they were not members of the union.  In this complaint, the plaintiffs withdrew their request for reinstatement in the bargaining unit and proceeded only on claims for damages.

On March 28, 2003, the plaintiffs filed a renewed motion to remand their claims to state court, arguing once again that their claims were not preempted by § 301 of the LMRA and that the court lacked subject matter jurisdiction.  Judge Godich denied the motion on February 24, 2004, reiterating that each claim required plaintiffs to prove damages, which required reference to the collective bargaining agreement to determine seniority and to which job each plaintiff would

---

[1](...continued)
any way.  These plaintiffs simply have not asserted hybrid claims and could not have obtained any relief from grievance and arbitration procedures that were not available to them at all.  Their claims are more closely analogous to state-law claims for fraud, breach of contract, and promissory estoppel.  See *International Union of Elevator Constructors v. Home Elevator Co., Inc.*, 798 F.2d 222, 227 (7th Cir. 1986) (reversing district court's decision to borrow six month statute of limitations from federal law even though union was a party and stating: "the fact that the contract at issue also contained an arbitration clause does not reduce the similarity between the section 301 cause of action and a breach of contract claim").

The court agrees with Judge Godich that the most analogous claim to the promissory estoppel claim is a state law claim for breach of an unwritten employment contract.  The appropriate statute of limitations is two years, see Ind. Code § 34-11-2-1, and plaintiffs' claims that were tried were timely.

have been entitled to transfer if General Motors had kept its promises to them. Docket No. 254.

General Motors filed a renewed motion for summary judgment on March 6, 2003.  Judge Godich denied the motion on June 3, 2004.  Docket No. 255.  Judge Godich once again stated that the plaintiffs' state law claims were preempted by § 301 of the LMRA and that federal common law would determine their rights.  *Id.* at 12.  Judge Godich wrote:

> Interpreting the facts in a light most favorable to the plaintiffs, independent promises regarding their rights to return to the hourly workforce were made to them prior to and after the Salaried Employment Cards were executed. If it were found that GM should have realized that such promises would induce plaintiffs to act in forbearance and they did so act, then the promise becomes binding under common law principles.

*Id.* at 14, citing Restatement (Second) of Contracts § 90(1) (promissory estoppel).

On May 3, 2007, the court vacated the order of reference to Judge Godich, who retired in December 2007.  Judge Godich had advised the court that he was unable to devote appropriate time to this case.  ECF Docket No. 72.[2]  The court has tried to bring this long-pending case to closure as quickly as possible.

---

[2]The Southern District of Indiana implemented the Electronic Case File ("ECF") system while this case was pending.  The court has cited the ECF docket number for documents filed after October 14, 2004.

General Motors moved to divide the case into a series of separate jury trials. The court ordered that the case would be divided into four separate jury trials. ECF Docket No. 13.  The first trial was eventually scheduled for January 14, 2008. As the trial approached, both parties submitted proposed jury instructions and motions *in limine*.  The defendant moved to strike the plaintiffs' proposed jury instruction for fraud on December 28, 2007, arguing that plaintiffs' claims of fraud were preempted by federal labor law.  ECF Docket No. 180.[3]  Two business days before trial, General Motors filed a motion to strike the plaintiffs' demand for a jury on their promissory estoppel claims.  ECF Docket No. 208.  The court took that motion under advisement and informed the parties that it would proceed as scheduled with a jury and would treat the jury's verdicts on the promissory estoppel claims as advisory in the event that it found that the plaintiffs had no right to a jury on those claims.  See Fed. R. Civ. P. 39(c) (authorizing advisory jury).

The first trial for five plaintiffs' claims was held from January 14 through January 24, 2008.  At the close of the plaintiffs' case-in-chief, General Motors moved for judgment as a matter of law under Rule 50(a) on plaintiffs' fraud claims and on the promissory estoppel claims of plaintiffs Crawley and Hamilton.  The court took the motions under advisement.  At the close of all evidence, General Motors renewed its motion for judgment as a matter of law.

---

[3]The court took this motion under advisement.  At trial, the court instructed the jury on the plaintiffs' fraud claims, and the jury found for the defense.  This motion (ECF Docket No. 180) is deemed denied.

The court instructed the jury as to both the promissory estoppel and the fraud claims.  The jury found that each plaintiff had proved his or her claim for promissory estoppel by a preponderance of the evidence.  The jury awarded the five plaintiffs a total of $3,105,261.  The jury found that none of the plaintiffs had proved fraud.

*Discussion*

I.      *Plaintiffs' Case and General Motors' Motion*

General Motors has renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and in the alternative has moved for a new trial under Rule 59(a).  In its effort to avoid responsibility for the promises it clearly made and expected the plaintiffs to rely upon, General Motors has asserted a host of arguments, including several that are diametrically opposed to positions it took at earlier stages of this litigation.

Under Rule 50, a court should grant judgment as a matter of law when a party has been fully heard on an issue and no legally sufficient basis exists for a reasonable jury to find for that party on the issue.  *Alexander v. Mount Sinai Hospital Medical Center*, 484 F.3d 889, 902 (7th Cir. 2007).  The standard mirrors the standard for deciding a motion for summary judgment.  *Id.*  The Supreme Court has explained:

> in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (internal citations omitted). In addressing General Motors' motions for judgment as a matter of law, the court reviews the evidence in the light most favorable to the plaintiffs, granting the plaintiffs every reasonable inference that the jury might have drawn in their favor. See *Zimmerman v. Chicago Board of Trade*, 360 F.3d 612, 623 (7th Cir. 2004) (affirming district court's decision to grant judgment as a matter of law). The court may set aside the jury's verdict and enter judgment as a matter of law only when the evidence is such that, without resolving conflicts in the testimony or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable jurors could have reached. *Lane v. Hardee's Food Systems, Inc.*, 184 F.3d 705, 706-07 (7th Cir. 1999); *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir. 1999).

In deciding on a motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure, the court must determine whether the jury's verdict was against the weight of the evidence, whether the damages were excessive, or whether the trial was unfair for other reasons. *Westchester Fire Insurance Co. v.*

*General Star Indemnity Co.*, 183 F.3d 578, 582 (7th Cir. 1999).  The grant or denial of a new trial is a matter for the court's sound discretion.  *General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc.*, 695 F.2d 281, 288 (7th Cir. 1982).

Before analyzing the specific issues raised in General Motors' motion, it may be useful to set the scene in a little more detail.  The five plaintiffs whose claims were tried together all worked in hourly-wage jobs in the bargaining unit of General Motors' Allison Engine division making jet engines.  Their jobs required high skill, and they earned good wages with substantial overtime, good benefits, and a relatively high degree of job security.  Plaintiffs offered evidence from senior General Motors managers showing that first-line supervisor positions at General Motors factories are the most difficult jobs in the company, and among the most important.  First-line supervisors are ordinarily recruited from the ranks of the hourly workers, but those supervisors must give up the security and benefits of a unionized, hourly wage job.  To recruit the best hourly workers, including these plaintiffs, to give up the security and benefits, General Motors managers promised the plaintiffs that they could quit their jobs as supervisors and return to the hourly workforce anytime they wanted to do so.  When these plaintiffs became supervisors, General Motors did not impose time limits on such requests.

In this lawsuit, General Motors has tried to deny these promises by relying on written employment agreements that the plaintiffs signed annually after becoming salaried employees.  The annual agreements stated that no other

agreements or understandings existed regarding their employment.  Ex. 101.
However, as explained below, the plaintiffs presented extensive evidence, including
documents from General Motors management to plaintiffs, that conflicted with
those annual agreements.  The evidence showed that General Motors itself
understood perfectly well that it had made these promises to new first-line
supervisors and that those supervisors were entitled to rely on those promises.
General Motors' reliance on the annual forms to deny this well established and
documented practice and the undisputed promises was not a defense that the
court or jury was required to accept.

General Motors understood that its promises to recruit first-line supervisors
were expensive.  On September 19, 1990, the Personnel Administration and
Development Policy Group within General Motors submitted a proposal to the
Management Committee to change the rules applicable to hourly/salary transfers
"as a means of minimizing certain non-competitive outcomes."  Ex. 14 at 2.  The
proposed rule would give an employee who transferred from an hourly to a
salaried position a one-year probationary period during which the employee could
transfer back to hourly at any time at the request of management or the employee.
At the end of the year, the employee and management would make an irrevocable
decision to remain in salaried employment or to transfer back to hourly.  *Id.* at 6.
The proposal stated:  "In terms of employee relations impact, the proposed
modification may deter some hourly employees from accepting salaried jobs. . . .
The proposed provisions would result in significant annual savings of $20-75

million."  *Id*. at 7.  The Management Committee accepted the proposal and implemented the new policy in 1990 for newly recruited supervisors, but not for these plaintiffs.

On November 19, 1990, Marvin Recht, General Director of Personnel and Communications at the Allison Engine division of General Motors, sent a letter to all individuals who had transferred from hourly to salaried employment prior to the date the new policy was scheduled to go into effect.  Ex. 1.  The letter outlined the new policy and stated:

> it is important to understand how this policy change applies to individuals like yourself, who transferred from hourly to salary prior to December 1, 1990 under the former policy provisions.  In short, nothing will change if you do not want it to.  *If you want to retain the ability to return to hourly as your salaried employment continues, that will be a perfectly acceptable option.* The other alternative available to you is to elect to assure continued treatment only as a salaried employee.  By relinquishing your eligibility to return to hourly, you would eliminate the possibility of being returned to the hourly workforce, thereby electing all future treatment as a salaried employee.

Ex. 1 at 1 (emphasis added).  Along with the letter, each employee received a form entitled "Agreement to Retain or Relinquish Hourly Recall Right."  Ex. 2.  The employees could check box stating that they elected to relinquish their eligibility to return to the hourly workforce or check a box stating that they elected to retain their eligibility to return to the hourly workforce.  All of the plaintiffs signed these forms and elected to retain their eligibility to return to the hourly workforce.  Exs. 3-7.

The plaintiffs presented evidence that approximately a year before the change in policy, David Mowers, Director of Policy Development and Employee Relations for General Motors, had drafted a memorandum to General Motors executives in October 1989 stating that he believed salaried employees had no right to return to hourly payroll unless there was a reduction in force among salaried workers.  Mowers concluded that, "except for a reduction in the salaried workforce, the return of a salaried employee to the hourly payroll is strictly a management prerogative."  Ex. 12 at 1.  But the documents given to plaintiffs describing the new policy General Motors announced in 1990 did not reflect this new and very different view that the employees had a right to transfer back to hourly only in the event of a reduction in force or at the discretion of management. Instead, General Motors told plaintiffs and others in their situations that "nothing will change if you do not want it to."

Plaintiffs also offered ample evidence that as General Motors planned to sell the Allison Engine division to a management-led group, the managers realized that the promises to the first-line supervisors could become a serious problem.  If too many supervisors returned to hourly jobs, the efficiency and value of the division as a going concern might have been diminished, leaving the buyer unhappy and perhaps even looking to General Motors for recourse.  General Motors therefore made a decision in September 1993 to stop honoring the promises it had made to the first-line supervisors.  General Motors did not tell the plaintiffs or other

supervisors of this change of policy.   Instead, General Motors simply began discouraging or denying requests to return, or stalling until the sale.

General Motors has argued that it had good business reasons for breaking its promises to these plaintiffs and that honoring the promises could have been expensive for General Motors.  The court assumes General Motors is correct on those points. American law allows a party to break a promise for such self-interested reasons, but only if that party also pays damages to the wronged parties.  The jury found that all five plaintiffs were worse off than they would have been if General Motors had kept its promises to them and had allowed them to return to the bargaining unit before the Allison Engine sale.

II.     *Promissory Estoppel Claims*

General Motors asserts numerous errors with regard to plaintiffs' promissory estoppel claims.  First, General Motors argues that plaintiffs had no right to a jury trial on their promissory estoppel claims.  Second, despite the fact that it argued many times over more than twelve years that plaintiffs' state law claims were preempted by § 301 of the LMRA, General Motors now argues that Indiana law governs the plaintiffs' promissory estoppel claims and that the plaintiffs did not prove one element of promissory estoppel under Indiana law. Finally, General Motors argues that plaintiffs Hamilton and Crawley did not prove that they asked to return to the bargaining unit prior to the date of the sale of the

Allison Engine division and thus did not prove one element of promissory estoppel. None of these arguments are persuasive.

A.     *Right to a Jury Trial*

1.     *Timing of the Motion*

Two business days before the trial, General Motors filed its motion to strike the plaintiffs' demand for a trial by jury on their claims for promissory estoppel. As explained below, the court concludes that plaintiffs were entitled to a jury trial, but even if that conclusion is wrong, the court had and still has the discretion to deny the defendant's motion to strike the demand for a jury because the motion was filed so late.   Plaintiffs exercised their rights under Federal Rule of Civil Procedure 38 when they demanded a jury trial in their initial complaint and in each of the amended complaints they filed.   Federal Rule of Civil Procedure 39(a) provides that when a jury trial has been demanded and the trial designated on the docket as a jury trial, the trial shall be heard by a jury unless (1) the parties file a stipulation to a bench trial or so stipulate on the record or (2) the court upon motion or on its own initiative finds that a right to trial by jury of some or all of those issues does not exist under the Constitution or federal law.

Parties "have a great deal of latitude on the timing of motions to strike a jury demand," but the court has discretion to decide whether a motion to strike a jury demand is timely or too late.  *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212,

226-27 (3d Cir. 2007) (affirming decision to grant motion to strike jury demand filed six weeks before trial), quoting Moore's Federal Practice ¶ 8-39.13; accord, *Kramer v. Banc of America Securities, LLC*, 355 F.3d 961, 968 (7th Cir. 2004); *Cantiere DiPortovenere Piesse S.p.A. v. Kerwin*, 739 F. Supp. 231, 235-36 (E.D. Pa. 1990) (denying motion for new trial based on district court's denial of motion to strike jury demand when the moving party had requested a jury two and a half years earlier).

In making its decision, the court should consider issues such as judicial economy and whether the opposing party will be prejudiced by trying her case to a court instead of a jury.  See *Tracinda Corp.,* 502 F.3d at 226 (analyzing motion to strike jury demand based on doctrine of laches, including whether the party moving to strike at a late date had inexcusably delayed and whether that delay prejudiced the opposing party); *Kramer*, 355 F.3d at 968 (affirming district court's grant of motion to strike jury demand two weeks before trial because the opposing party had not shown she was prejudiced by having a court trial); *Adams v. Falcon Drilling Co., Inc.*, 1998 WL 195981, at *1-2 (E.D. La. 1998) (denying motion to strike jury demand because it was made twelve days before trial and two days before pre-trial submissions were due, would prejudice the opposing party, and would have a deleterious effect on both parties' orderly preparation for trial).

The plaintiffs filed their initial complaint on July 3, 1995.  For more than twelve years, the parties debated whether the plaintiffs' claims were preempted by

federal law, were barred by an applicable statute of limitations, or suffered some other fatal flaw.  At no time during this twelve year period did General Motors challenge the plaintiffs' rights to a jury trial on their promissory estoppel claims.  The parties conducted discovery and prepared for trial with the understanding that all claims would be tried to a jury.  As the first trial date approached, General Motors filed proposed jury instructions on December 21, 2007.  General Motors' own proposed instructions included instructions on the plaintiffs' promissory estoppel claims.  ECF Docket No. 157.  The court held a final pretrial conference on January 4, 2008.  Among other matters, the court ruled on several motions *in limine* (that were designed to address a jury trial) and set up a time-line for assembling notebooks with key documents that would be distributed to the members of the jury.  At no time did General Motors suggest that plaintiffs might not be entitled to a jury trial on the promissory estoppel claims.

Not until January 10, 2008, nearly a week after the final pretrial conference and just two business days before trial would begin, did General Motors file its motion to strike the jury trial for plaintiffs' promissory estoppel claims.  ECF Docket No. 208.  By that time, a jury panel had already been called, and the court and counsel had spent considerable time preparing for a jury trial, including such matters as assembling juror notebooks.

The court declined to disrupt trial preparations based on this last minute about-face by General Motors.  Without digging into the merits of the issue at that

busy time, the court advised counsel that it would take the motion to strike the jury demand under advisement and proceed to try the entire case to a jury.  The court also informed counsel that if the court ultimately concluded that General Motors' motion was not too late and had merit, the court would treat the jury verdicts on promissory estoppel as advisory verdicts.

General Motors' timing and the prejudice to plaintiffs and the court are reason enough to deny the motion to strike the jury demand.  Having now heard the evidence, and viewing the motion in the context of the extraordinary volume and variety of arguments that General Motors has raised over the nearly thirteen year history of this case to try to avoid a trial, the court interprets the last minute motion to strike the jury demand as merely one more attempt to plant one more appealable issue in a case in which General Motors and its counsel knew that the evidence of its wrongdoing would be compelling.

2.    *Merits of the Motion to Strike the Jury Demand*

General Motors' motion is not persuasive on the merits.  Both sides agree that plaintiffs were entitled to a jury trial on their fraud claims, but General Motors argues that the promissory estoppel claims sounded in equity and were not subject to a jury trial.  The Seventh Amendment states:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. . . ."  The Supreme Court has interpreted the phrase

"suits at common law" to mean suits in which legal rights were to be ascertained, as opposed to suits in which equitable rights were recognized and equitable remedies were administered. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).

Deciding whether there is a right to a jury trial requires a two-pronged analysis. First, the court must compare the action to eighteenth century actions brought in the courts of England prior to the merger of courts of law and courts of equity. Second, the court must examine the remedy sought and determine whether it is legal or equitable in nature. *Tull v. United States*, 481 U.S. 412, 417-18 (1987). The second stage of the analysis is more important than the first. *Id.* at 421.

After much debate over whether their claims were preempted by federal law, the plaintiffs asserted their federal promissory estoppel claims in their Sixth Amended Complaint under § 301 of the LMRA. A court deciding claims under the LMRA must decide whether there is a right to a jury trial on a case-by-case basis by analyzing the rights and remedies at issue. *Bugher v. Feightner*, 722 F.2d 1356, 1357-58 (7th Cir. 1983) ("the LMRA is silent on the issue of the right to a jury trial and the legislative history is similarly unenlightening."). The court must determine whether there is a right to a jury on the plaintiffs' promissory estoppel claims by analyzing the nature of the claims and the remedy sought.

Promissory estoppel has its historical antecedents in both law and equity. *Merex A.G. v. Fairchild Weston Systems, Inc.*, 29 F.3d 821, 824 (2d Cir. 1994), citing John D. Calamari & Joseph M. Perillo, Contracts § 6-1, at 272 (3d ed. 1987). Promissory estoppel is typically invoked in two types of situations. The first type, detrimental reliance, arises when there is "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance . . . ." Restatement (Second) of Contracts § 90. The second type arises when a contract would be unenforceable based on a statute of frauds. See Restatement (Second) of Contracts § 139(1).

"[E]nforcement of informal contracts in the action of assumpsit rested historically on justifiable reliance on a promise." *Merex*, 29 F.3d at 824, quoting Restatement (Second) of Contracts § 90 comment a. On the other hand, promissory estoppel is also a descendent of equitable estoppel, which was a doctrine first fashioned in the courts of equity. *Id.*, citing 2 Fred F. Lawrence, Equity Jurisprudence § 1046, at 1132 (1929) ("Jurisdiction of equity courts to prevent fraud by the use of estoppel is a 'very old head of equity.'"). Because of the dual nature of a promissory estoppel claim, the Second Circuit explained in *Merex*:

> Thus, the protean doctrine of "promissory estoppel" eludes classification as either entirely legal or entirely equitable, and the historical evidence is equivocal. It is clear, however, that both law and equity exert gravitational pulls on the doctrine, and its application in any particular case depends on

the context in which it appears.  For example, where a plaintiff sues for contract damages and uses detrimental reliance as a substitute for consideration, the analogy to actions in assumpsit (law) is compelling.  By contrast, when the plaintiff uses promissory estoppel to avoid a draconian application of the Statute of Frauds, the pull of equity becomes irresistible.

*Id.* at 825.


Here, the oral promises that General Motors managers made to the plaintiffs are not unenforceable based on a statute of frauds.  Proceeding under federal common law, there is no applicable federal statute of frauds.  Even if the common law were to draw on the Restatements to supply such a "statute," section 110(1)(e) of the Restatement (Second) of Contracts states that contracts that are not to be performed within one year from the making are subject to the statute of frauds.  The clear implication is that contracts that could be performed within one year are not subject to the statute of frauds.  Similarly, under Indiana law, an oral contract that it is possible to complete within one year does not fall within the statute of frauds.  Ind. Code § 32-21-1-1(b)(5); *Tobin v. Ruman*, 819 N.E.2d 78, 84-85 (Ind. App. 2004); *Wallem v. CLS Industries, Inc.*, 725 N.E.2d 880, 886-87 (Ind. App. 2000).  General Motors representatives promised the plaintiffs that they could transfer back to the hourly workforce at any time, which could have been within one year of when the promises were made.  It was not impossible to complete performance within one year.[4]

---

[4]General Motors argues that Indiana courts consider whether the parties *intended* for the promise to be performed within one year, not whether it was *possible* for the promise to be performed within one year.  However, the court in

(continued...)

Because the promissory estoppel claims were not needed to avoid application of a statute of frauds, the claims are properly described as detrimental reliance claims. A detrimental reliance claim is an action at law. *Merex*, 29 F.3d at 825. The first factor thus points toward a right to a jury trial for these plaintiffs' claims.

Turning to the second prong, the Seventh Circuit has explained that while there is no cut-and-dried rule for determining whether a remedy is legal or equitable in nature, it is possible to draw general distinctions between the two forms of relief. Legal remedies traditionally involve money damages. *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004); see also *Mertens v. Hewitt Associations*, 508 U.S. 248, 255 (1993) ("Money damages are, of course, the classic form of *legal* relief."); *Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000) (stating that a claim for money due under a contract is quintessentially an action at law). Equitable remedies are typically coercive,  are enforceable directly on the person or thing to which they are directed, and are discretionary. *International Financial Services*, 356 F.3d at 736.

---

[4](…continued)
*Tobin v. Ruman* made it clear that "only if it is *impossible* for an oral contract to be completed within one year does it fall within the Statute of Frauds."  819 N.E.2d at 85 (emphasis in original).  The court also agrees with plaintiffs that they offered evidence of written promises by General Motors sufficient to satisfy the Indiana statute of frauds even if it had applied to these promises.  See Ex. 1 ("If you want to retain the ability to return to hourly as your salaried employment continues, that will be a perfectly acceptable option."); see also Exs. 2 and 14.

Here, the plaintiffs abandoned their earlier requests to be reinstated as hourly employees at General Motors.[5]  At trial, plaintiffs sought damages based on the differences between their wages, pensions, and health benefits as salaried employees and the wages, pensions, and health benefits they would have received if they had remained members of the hourly workforce and retirees from General Motors.   These damages are money damages, a legal remedy subject to jury trial.  On the other hand, the court has discretion to limit the remedy for promissory estoppel "as justice requires."  Restatement (Second) of Contracts § 90; *Merex*, 29 F.3d at 826.  This aspect of the claim tends to weigh in favor of the relief sought being treated as equitable.

The Seventh Circuit has explained that when a promissory estoppel claim of the detrimental reliance variety is asserted, the court substitutes reliance by the promisee for any required element of the contract that might be missing (such as consideration).  The full value of the promise is the appropriate remedy unless the terms of the promise are unclear.   *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 703 (7th Cir. 2004).  Based on the strong similarities between a promissory estoppel claim based on detrimental reliance and a breach of contract claim, these plaintiffs seek damages under a detrimental reliance claim that are comparable to the damages sought for breach of contract, which are legal in nature.

---

[5]The Sixth Amended Complaint made clear that the plaintiffs sought money damages only.  The court dismissed the claims against the union, including requests for reinstatement, on May 10, 2007.  ECF Docket No. 74.

Because the nature of the plaintiffs' promissory estoppel claim was legal and the nature of the remedy sought by the plaintiffs was also primarily legal, the plaintiffs had a right to a jury trial on their promissory estoppel claims. Accordingly, the court denies General Motors' motion to strike the plaintiffs' demand for a jury both because the motion was filed too late and because it was wrong on the merits.

In addition, the court informed the parties that if it were to find that the plaintiffs had no right to a jury trial on their promissory estoppel claims, the court would treat the jury's verdict as advisory. The court recognized that this issue was hovering in the background of trial, so the court listened to the evidence on the assumption that it might be the trier of fact on these claims. Even if the court were inclined to overlook the timing of the motion and to grant the defendant's motion to strike the jury demand, the court would agree with the jury's verdicts in all respects on these plaintiffs' claims. Plaintiffs' evidence was powerful and compelling. General Motors' defenses were weak attempts to evade responsibility for the promises it had made to some of its best and most important employees to persuade them to give up the security and benefits they had had under the union's protection. To the extent the company has a conscience, General Motors and its management should be ashamed of the way they treated these employees. If necessary, the court could spell out in the future detailed findings of fact and conclusions of law on these claims.

B.      *Federal Law or State Law?*

General Motors' second major argument for judgment as a matter of law also reflects a late about-face.  The issue is whether plaintiffs' promissory estoppel claims are governed by federal common law or by state law.  Throughout the litigation of this case, General Motors has taken the position that plaintiffs have no claims under state law and that federal law preempts and governs any and all of their claims for relief.   See, *e.g.*, Def. Response to Pl. Renewed Motion to Remand, Docket No. 238 at 3-17, Apr. 15, 2003 (stating: "Allowing Plaintiffs to pursue state law claim (sic) in state court will upset the relationship between GM and the UAW and open the collective bargaining agreement to inconsistent and unpredictable interpretations . . ." and arguing that it would be necessary to analyze paragraph 69, Document 86, local seniority agreements, and the Memorandum of Understanding between GM, Allison Engine Company, and the UAW to decide plaintiffs' claims); Def. Response to Pl. Motion to Remand, Docket No. 19 at 2-3, Dec. 14, 1995 (arguing that federal law preempts plaintiffs' state law claims because "the consideration and interpretation of any alleged promise that Plaintiffs could unilaterally return to the bargaining unit and be credited with full seniority [time worked in both and hourly and salaried positions] necessarily depends on provisions of the collectively bargained agreements entered into between UAW Local 399 and the Allison Gas Turbine Division of General Motors.").

General Motors now argues that there is an important difference between federal promissory estoppel and Indiana law on the subject. General Motors seeks judgment as a matter of law on the grounds that plaintiffs have no evidence to support what it contends is an additional element of promissory estoppel under Indiana law, and that the Seventh Circuit, at least, does not recognize a claim for promissory estoppel under these circumstances. General Motors argues further that, at the very least, a new trial is required because the court did not instruct the jury properly on the elements of promissory estoppel. The court disagrees on these points.

1.    *Invited Error*

The court gave the following instruction to the jury on the elements of plaintiffs' promissory estoppel claims:

> To prevail on their claims of promissory estoppel, the five plaintiffs have the burden of proving the following elements by a preponderance of the evidence:
>
> (1)    that General Motors made a promise to that plaintiff at the time he or she accepted a salaried, supervisory position, that he or she would keep the right to return to an hourly, unionized job upon his or her request;
>
> (2)    that General Motors made the promise with the expectation that the plaintiff would rely upon it;
>
> (3)    that the plaintiff accepted the salaried, supervisory position in reliance upon General Motors' promise that he or she could return to the hourly, unionized job upon his or her request at any time in the future;
>
> (4)    that the plaintiff reasonably relied upon the promise;
>
> (5)    that General Motors did not keep the promise;

> (6)   that the plaintiff suffered a financial loss because General Motors broke the promise, and an award of damages for breaking the promise is needed to avoid what would otherwise be an injustice.

Jury Instruction No. 14.  General Motors argues that this instruction was incorrect because it did not require plaintiffs to prove an "unjust and unconscionable injury" to the plaintiffs that was independent of the benefit of the bargain.  The court addresses the merits of the point below, but must first address how the court came to give the instruction.

On December 21, 2007, General Motors submitted proposed jury instructions to the court.  ECF Docket No. 157.  General Motors' proposed the following jury instruction for the elements of the promissory estoppel claims:

> To prevail on their claim of promissory estoppel, each Plaintiff has the burden of proving the following elements by a preponderance of the evidence:
>
> (1)   that General Motors made a promise to a Plaintiff at the time he or she accepted a salaried supervisory position that he or she had the unilateral right of return to the hourly bargaining unit upon his or her request;
> (2)   that the promise was made by General Motors with the expectation that a plaintiff would rely upon it;
> (3)   that General Motors did not keep this promise;
> (4)   that a plaintiff reasonably relied upon ths promise;
> (5)   that a plaintiff accepted the salaried position in reliance on the promise that he or she could return to the hourly bargaining unit at any time in the future upon his or her request;
> (6)   that an award of damages for breach of the promise avoid (sic) what otherwise would be an injustice.

*Id.* at 17.

General Motors' instruction is almost identical to the instruction the court gave to the jury.  The elements appear in a different order, and there are small changes to the wording of some of the elements.  The only other difference is that the court's instruction required the plaintiffs to prove that they suffered a financial loss because General Motors broke the promise, an award for which was necessary to prevent injustice.  General Motors' proposed instruction did *not* include a separate element of an "unjust and unconscionable injury" independent from the benefit of the bargain, nor did General Motors object to the court's final instruction based on the absence of such an element.  A party cannot complain that the court gave an instruction that was substantially similar to the instruction proposed by that party.  See *Susan Wakeen Doll Co. v. Aston Drake Galleries*, 272 F.3d 441, 455 (7th Cir. 2001) (party could not object on appeal to special verdict question that party had drafted); *McVeigh v. McGurren*, 117 F.2d 672, 680 (7th Cir. 1940) (where defendant did not object to instructions given, assignment of error on appeal would not be considered).  Even if the court's instruction was an error (and the court does not believe it was), it was an error invited by General Motors itself.

2.    *The Merits of General Motors' Arguments*

General Motors' motion raises the issue whether plaintiffs' promissory estoppel claims arose under federal law or state law.  Plaintiffs pleaded the promissory estoppel claims as federal claims after Judge Godich held, agreeing with General Motors, that all of plaintiffs' state law claims were preempted by federal law.  Judge Godich wrote that promissory estoppel offered a potentially viable theory for plaintiffs under federal common law.  Docket No. 255 at 15.

Section 301(a) of the LMRA provides for federal jurisdiction over disputes concerning collective bargaining agreements that are subject to federal law:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  Beginning with *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 (1957), the Supreme Court has interpreted § 301 as preempting the field of state law claims that arise under collective bargaining agreements governed by federal law.  The boundaries of this field of preemption are not easy to draw precisely.  See *Livadas v. Bradshaw*, 512 U.S. 107, 124 n.18 (1994) (noting lack of uniformity among federal circuit courts of appeals in understanding and applying preemption principles for claims arising under § 301 of the LMRA, but

not finding the occasion fit for resolving disagreements on these issues).  However, some general principles are clear.

Just because a lawsuit concerns an employment dispute or involves tangentially a provision of a collective bargaining agreement does not mean that federal law preempts the state law claims.  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).  A state law claim is preempted only when it asserts rights or obligations arising under a collective bargaining agreement or when its resolution is substantially dependent on the terms of the collective bargaining agreement. The mere need to consult a collective bargaining agreement does not require preemption; preemption is required only when the resolution of the claim depends on the disputed meaning of or requires interpretation of contract terms.  *Livadas*, 512 U.S. at 124; *Loewen Group International, Inc. v. Haberichter*, 65 F.3d 1417, 1421-22 (7th Cir. 1995).

By itself, the need to refer to a collective bargaining agreement to assess the appropriate amount of damages to award based on a state law claim does not require preemption:

> A collective-bargaining agreement may, of course, contain information such as rate of pay and other economic benefits that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled.  Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand.

*Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 413 n.12 (1988) (internal citations omitted).   In such a situation, federal law would govern the interpretation of the agreement for the purpose of assessing damages, but state law would govern the underlying claim.

Judge Godich held in his April 26, 1998 Order on General Motors' Motion for Summary Judgment that the plaintiffs' state law claims were preempted by § 301 of the LMRA.  He explained that it would be necessary to refer to the collective bargaining agreement to assess the amount of damages to which each plaintiff was entitled in the event that he/she proved that General Motors was liable for any of the claims against it, and that each of the state law claims required proof of damages as an element of the claim.  Judge Godich anticipated that the parties would need to interpret paragraph 69 of the October 24, 1993 collective bargaining agreement between General Motors and the UAW and Document 86 to calculate each plaintiff's seniority and to determine which jobs, if any, each plaintiff would have been permitted to transfer to if General Motors had kept its promises.  General Motors had argued in both its response to plaintiffs' motion to remand and its response to plaintiffs' renewed motion to remand that it would be necessary to analyze paragraph 69, Document 86, local seniority agreements, and the Memorandum between GM, Allison Engine Company, and the UAW to decide plaintiffs' claims.  Docket No. 19 at 2-3; Docket No. 238 at 3-17.

The issue of whether jobs would have been available for the plaintiffs in the bargaining unit if General Motors had permitted them to transfer back was contested at trial.  The plaintiffs all testified that they believed they would have been able to transfer back to the jobs they had held previously in the bargaining unit based on the seniority they had accrued.  They testified that each plant had a seniority board that listed the seniority of each of the employees from that plant in the bargaining unit.  The plaintiffs could determine based on their own seniority dates where they would fall on the seniority board if they were in the bargaining unit.  See, *e.g.*, III Tr. 439-40 (Hamilton).  On the other hand, Arthur Schwartz, general director of labor relations at General Motors, testified that General Motors' hourly workforce decreased at a rapid rate between 1992 and 2007, which might have made it difficult for the plaintiffs to transfer to jobs in the bargaining unit and to retain those jobs until retirement.

It is not apparent that either side at trial actually used paragraph 69 or Document 86 to calculate each plaintiff's seniority or to determine the plaintiffs' transfer rights to jobs in the bargaining unit.  It was certainly possible that either or both sides might have performed such calculations in an attempt to prove or disprove whether the plaintiffs' reliance on the promises made by General Motors representatives had damaged the plaintiffs.  It is clear that the plaintiffs had the burden of proving that their reliance on the promises harmed them.  At the trial,

General Motors appeared to concede this point.[6]  The fact that the plaintiffs were required to prove detrimental reliance is underscored by General Motors' arguments in its motion for judgment as a matter of law that the plaintiffs introduced no evidence to show that their reliance on the promises was detrimental.  Def. Br. 16-17 (recognizing that detrimental reliance is an essential element of promissory estoppel).

Because it was necessary for plaintiffs to prove that their reliance on promises by General Motors caused damages, which could have required genuine interpretation of the collective bargaining agreement, the court agrees with Judge Godich's conclusion that the plaintiffs' state law claims are preempted by § 301 of the LMRA and that federal common law can provide a promissory estoppel remedy.  See Docket No. 255 at 15, consistent with *Shields v. Local 705, International Brotherhood of Teamsters Pension Plan*, 188 F.3d 895, 901 (7th Cir. 1999) (recognizing promissory estoppel as part of federal common law in context of an ERISA claim).

---

[6]Judge Godich correctly determined the preemption issue based on the arguments presented to him.  The fact that the parties ultimately did not wrestle over these particular issues at trial does not undermine the validity of his decision.  It would be unworkable to allow a party like General Motors first (a) to argue that a contested issue requires preemption, then (b) to make a strategic decision not to contest that issue at trial that could have required interpretation of a collective bargaining agreement, and then (c) to argue after an adverse verdict based on federal law that the claim was not pre-empted because that issue requiring the interpretation of the collective bargaining agreement ultimately was not contested.

3.     *Elements of Promissory Estoppel*

The jury instructions accurately reflect this court's view of the elements of a federal common law claim for promissory estoppel under the circumstances of this case.  In *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962), the Supreme Court stated that the area of labor relations calls for uniform law. To foreclose the possibility of individual contract terms having different meanings under state and federal law and to promote "industrial peace" by enabling a process of free and voluntary collective bargaining, the Court held that federal law should be applied to claims brought under § 301 of the LMRA.  *Id.*  In doing so, federal courts have the authority to fashion a body of federal law for the enforcement of collective bargaining agreements.  *Textile Workers Union*, 353 U.S. at 457.  Federal courts may look to state law, if compatible with the purpose of § 301, to find the rule that will best effectuate federal labor policy.  *Id.*

Section 90(1) of the Restatement (Second) of Contracts is the root of the modern doctrine of promissory estoppel.  It states:  "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."  The Seventh Circuit has held that a claim for promissory estoppel under federal common law requires a plaintiff to demonstrate that he has relied to his detriment on a promise and that the reliance was reasonable.  *Shields*, 188 F.3d at 901

(discussing elements of promissory estoppel claim in context of ERISA claim); *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 759 (7th Cir. 1994) (same).[7]  Similarly, the Ninth Circuit has held that the elements of a promissory estoppel claim under federal common law are:  (1) that the defendant made a promise, (2) that the defendant reasonably should have expected to induce the promisee's reliance, (3) that the promise actually induced such reliance, (4) that the reliance was reasonable, and (5) that injustice can be avoided only by enforcement of the promise.  *Local 107 Office and Professional Employees International Union v. Offshore Logistics, Inc.*, 380 F.3d 832, 834 (9th Cir. 2004);  *Aguilar v. International Longshoremen's Union Local No.10*, 966 F.2d 443, 445 (9th Cir. 1992).


Indiana law is substantially similar.  As discussed above, under Indiana law, there are two types of promissory estoppel:  detrimental reliance and promissory estoppel that arises when the statute of frauds would prevent enforcement of a contract.  Section 139(1) Restatement (Second) of Contracts describes the second type of promissory estoppel:  "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is

---

[7]In *Shields*, the court distinguished a claim for promissory estoppel from a claim for estoppel or equitable estoppel under federal common law.  188 F.3d at 901 n.6, citing *Coker v. TWA*, 165 F.3d 579, 585 (7th Cir. 1999) (stating that a claim for estoppel has four elements:  (1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the plaintiff; (4) to her detriment), and *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 ("An estoppel arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation.").

enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise."  Indiana courts have declined to adopt § 139 of the Restatement but have recognized a narrower version of this type of promissory estoppel.  See *Coca-Cola Co. v. Babyback's International, Inc.*, 841 N.E.2d 557, 569 (Ind. 2006); *Whiteco Industries, Inc. v. Kopani*, 514 N.E.2d 840, 845 (Ind. App. 1987).  Indiana courts have expressed concern that the enforcement of a contract that did not meet the requirements of the statute of frauds would render the statute of frauds virtually meaningless.  *Coca-Cola Co.*, 841 N.E.2d at 568-69.  Therefore, the Indiana Supreme Court stated in *Brown v. Branch*:

> In order to establish an estoppel to remove the case from the operation of the Statute of Frauds, the party must show that the other party's refusal to carry out the terms of the agreement has resulted not merely in a denial of the rights which the agreement was intended to confer, but the infliction of an unjust and unconscionable injury and loss.  In other words, neither the benefit of the bargain itself, nor mere inconvenience, incidental expenses, etc. short of a reliance injury so substantial and independent as to constitute an unjust and unconscionable injury and loss are sufficient to remove the claim from the operation of the Statute of Frauds.

758 N.E.2d 48, 52 (Ind. 2001), quoting *Whiteco*, 514 N.E.2d at 845.


General Motors argues that the plaintiffs were required to prove, and failed to prove, that they suffered an "unjust and unconscionable injury" separate and apart from not receiving the benefit of the bargain they had made with General Motors.  However, as explained above at page 23, the statute of frauds does not prevent enforcement of the promises made by General Motors to the plaintiffs.  There is no federal statute of frauds, and under Indiana law, an oral contract that

it is *possible* to complete within one year does not fall within the statute of frauds. Ind. Code 32-21-1-1(b)(5); *Tobin*, 819 N.E.2d at 84-85.   General Motors representatives promised the plaintiffs that they could transfer back to the hourly workforce at any time, which could have been within one year of when the promises were made.   Even if the statute of frauds applied, General Motors confirmed the promises in writing, as seen in Exhibits 1, 2, and 14.   These plaintiffs' promissory estoppel claims are the detrimental reliance form of promissory estoppel.

The Indiana Supreme Court has adopted § 90 of the Restatement (Second) of Contracts, which encompasses the detrimental reliance variety of promissory estoppel. *First National Bank of Logansport v. Logan Manufacturing Co.*, 577 N.E.2d 949, 954 (Ind. 1991).  The Indiana Supreme Court has defined the elements of the detrimental reliance form of promissory estoppel to include the following elements: (1) a promise by the promisor (2) made with the expectation that the promisee will rely thereon (3) which induces reasonable reliance by the promisee (4) of a definite and substantial nature and (5) injustice can be avoided only by enforcement of the promise.  *Id.*  This definition of promissory estoppel is  similar to the elements of promissory estoppel under federal common law as defined by the Seventh Circuit and the Restatement.   Thus, whether the court looks to federal common law or state law, it reaches similar conclusions as to the elements of a promissory estoppel claim.   Neither of these definitions of promissory estoppel requires plaintiffs to prove an "unjust and unconscionable injury" separate and apart from

the benefit of the bargain.  The jury was properly instructed, essentially as General Motors itself had proposed.  The court sees no basis here for judgment as a matter of law or for a new trial.

C.   *Plaintiffs Hamilton and Crawley*

General Motors argues that the court should overturn the jury's verdicts for plaintiffs Harold Hamilton and Judith Inman Crawley because they did not prove that General Motors actually broke its promises to them.  The court instructed the jury that plaintiffs were required to prove that General Motors broke its promises that they would be permitted to return to the hourly workforce at any time upon their request by showing either "(a) that the plaintiff made such a request and the request was not honored, or (b) that General Motors acted deceptively or coercively in discouraging the plaintiff from making the request or from insisting that General Motors honor the promise."  Jury Instruction No. 15.  General Motors argues that Hamilton and Crawley did not prove that General Motors broke its promises to them through either of these avenues.

Based on the testimony at trial, there was ample evidence from which the jury could determine that Hamilton had made a request to return to the hourly workforce and that General Motors had not honored that request.  Hamilton testified that John Monet, his plant manager for the afternoon shift, approached him in September 1993 about transferring back to his hourly position.  Hamilton

told Monet at that time that he was not interested in transferring back.  Hamilton testified that he approached Monet in either October, November, or December 1993 and told him he would like to transfer back to the hourly workforce.  III Tr. 446.  Hamilton also testified that he spoke with John Lloyd, the day shift area manager, at some point between September 1993 and February 1994 about his desire to return to the hourly workforce.  Lloyd told him "no one was going back." III Tr. 447-48.

At his deposition in 1997, Mr. Hamilton had stated that he did not make a request to return to his position in the bargaining unit before the sale of the Allison Engine division.  When cross-examined at trial with the deposition testimony, he explained that he meant that he had not made a "formal" request to return to the hourly workforce.  He stated that he had never pursued the issue beyond telling Monet he wanted to go back.  "Maybe I didn't press Monet hard enough on the issue of going back.  When I say 'formal,' I mean I wanted him to take it – never told him to pursue it above that.  Just I want to go back and that was the extent of it."  III Tr. 450.  The extent of any inconsistency between Hamilton's statements in his deposition and his testimony at trial presented a credibility issue for the jury to decide.  It is the jury's job to assess the credibility of each witness and to determine how much weight to give that testimony. *Kapelanski v. Johnson*, 390 F.3d 525, 531 (7th Cir. 2004).  The jury was entitled to weigh Hamilton's trial and deposition testimony in light of the evidence that General Motors management had made a secret decision in September 1993 to

stop honoring its earlier promises to first-line supervisors like Hamilton.  These issues were fully aired at trial, and the jury found that Hamilton had proved his claim.  This determination is supported by evidence presented at the trial, when viewed most favorably to the plaintiff.

There was also sufficient evidence at trial for the jury to conclude that General Motors had broken its promise to plaintiff Crawley.  Crawley testified that in September 1993, she wanted to exercise her right to return to the hourly workforce because of problems she was having in her personal life and at work. She approached Bob Burgess, the plant manager, and told him she wanted to return to the hourly workforce.  She testified:

> And I told him it was because of health reasons, and I just needed to get out of that job and get my stress level down and it was affecting my health.  And he told me, he said don't – he says do not fill the letter out now.  He said you don't need to do that and, so I questioned him about it.  And, you know, he told me don't worry about it.  You don't have to turn [a request to transfer] in right now.  You have time.

III Tr. 490.  On cross-examination, Crawley testified that Burgess told her that it would not be wise for her to turn in a letter right then and that he told her to wait a couple of months to turn in a letter.  III Tr. 506-07.  After her conversation with Burgess, she decided to remain in her supervisory position for a few more months. Crawley testified that she would have submitted a letter requesting a transfer in September 1993 but for her conversation with Burgess.  III Tr. 493.

Plaintiffs offered evidence that would easily have allowed the jury to find that Burgess and General Motors deliberately deceived Crawley. Barry Smith, acting Director of Personnel Communications for the Allison Engine division of General Motors at time of the sale, testified that General Motors had frozen all transfers from supervisory positions to the hourly workforce in September 1993 so that it could "retain a viable workforce for the new purchaser." II Tr. 194. He testified that he did not know if anyone from General Motors ever told the employees orally or in writing about the freeze on transfers before or after it went into effect. II Tr. 195. He testified: "I don't know that we even talked about that. We just froze the transfers and tried to get through that time; and we didn't have a lot of conversation about it." II Tr. 196-97. Similarly, David Mowers, Director of Policy Development and Employee Relations for General Motors, testified that the ability to transfer out and back during the sale of the Allison Engine division was frozen. I Tr. 126. There is no evidence that General Motors management shared this news with plaintiffs or other first-line supervisors who would be affected by it.

Thus, Crawley presented evidence that General Motors acted deceptively in discouraging her from requesting to transfer back to the hourly workforce in September 1993. She approached Burgess asking to transfer back. He convinced her that the timing was not right for her transfer and that she should wait a couple of months. Crawley did not know at the time that the sale was pending and that General Motors would not allow her to transfer before or after the sale.

She also did not know that General Motors had already frozen all transfers. The jury could conclude that General Motors, by withholding this information from Crawley, deceptively discouraged her from making a request to transfer. There are no grounds for overturning the jury's verdict in favor of Crawley on her promissory estoppel claim.

III.     *Damages*

General Motors argues that the jury's damage awards were improper as a matter of law because the jury awarded "expectation" or "benefit of the bargain" damages and not reliance damages. General Motors also argues that the court should vacate the jury's damage awards because the evidence the plaintiffs presented of their damages was speculative. The court disagrees.

A.     *Expectation Damages or Reliance Damages?*

Section 344 of the Restatement (Second) of Contracts discusses the judicial remedies that are available to protect a promisee's interests:   expectation damages, reliance damages, and restitution damages.  The Restatement explains that a court ordinarily will enforce a broken promise "by protecting the expectation that the injured party had when he made the contract.  It does this by attempting to put him in as good a position as he would have been in had the contract been performed . . ."  *Id.*, § 344 comment a.  These damages are called expectation damages.  In contrast, a court may award damages to a promisee based on having "changed his position in reliance on the contract by, for example, incurring expenses in preparing to perform, in performing, or in foregoing opportunities to make other contracts."  *Id.*  These damages are called reliance damages and attempt to put the promisee back in the position he would have been in if the promise had not been made.  A third type of damages, restitution damages, is available to restore any benefit the promisee may have conferred on the other party.  *Id.*

There is no simple answer to the question of what type of damages are appropriate as a remedy for promissory estoppel.  The court concludes that under federal common law, the court and/or the jury has the discretion to fashion the remedy needed to avoid injustice based on a promissory estoppel claim, which can include either expectation damages or reliance damages.   Indiana law is

essentially the same in a case like this.  Even if only reliance damages were appropriate, General Motors has not shown that any error was prejudicial because reliance damages and expectation damages are so similar in this particular case.

        1.    *Federal Common Law*

Section 90(1) of the Restatement (Second) of Contracts states in part:  "The remedy granted for breach [of a promise upon which the promisee relied detrimentally] may be limited as justice requires."  Comment d to § 90 explains:

> A promise binding under this section is a contract, and full-scale enforcement by normal remedies is often appropriate.  But the same factors which bear on whether any relief should be granted also bear on the character and extent of the remedy.  In particular, relief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than by the terms of the promise.

This comment leaves open the possibility of granting the normal remedies for breach of contract, including expectation damages and specific performance, or instead granting reliance damages.  The illustrations included in comment d point to several cases in which courts have ordered reliance damages as a remedy for promissory estoppel.

In *Garwood Packaging Inc. v. Allen & Co.*, 378 F.3d at 702 (applying Indiana law but discussing promissory estoppel in general terms), the Seventh Circuit explained that promissory estoppel claims often arise when a promise was made but was not supported by consideration.  Promissory estoppel recognizes that

reliance in the form of changing one's position in a manner that cannot be recouped can act as a substitute for consideration:  "reasonable reliance is seen as nearly as good a reason for thinking there really was a promise as bargained-for reliance is."  *Id.*  Thus, if the promise that gives rise to the estoppel claim is clear, "the plaintiff will usually be awarded its value, which would be the equivalent of the expectation measure of damages in an ordinary breach of contract case."  *Id.* at 703; see also Edward Yorio & Steve Thel, *The Promissory Basis of Section 90*, 101 Yale L.J. 111, 130-31 (1991) (citing surveys of cases from 1970 to 1985 showing that the vast majority of courts ordered expectation damages as relief in promissory estoppel claims).  In *Garwood Packaging*, the Seventh Circuit also wrote that damages should be limited to expenses incurred by the plaintiff in reasonable reliance on the promise only in instances in which the underlying promise is unclear.  378 F.3d at 703; see also *Goldstick v. ICM Realty*, 788 F.2d 456, 464 (7th Cir. 1986) ("Consistent with our leanings, the Restatement of Contracts implies, if somewhat unclearly, that the value of the promise is the presumptive measure of damages for promissory estoppel, to be rejected only if awarding so much would be inequitable.").[8]

---

[8]This approach is consistent with the law of many states that recognize that courts have the discretion to award expectation damages or reliance damages for promissory estoppel claims.  See, *e.g.*, *Brookridge Funding Corp. v. Northwestern Human Services, Inc.*, 2007 WL 1834175, at *5 (D. Conn. June 26, 2007) (stating that under Connecticut law the usual recovery for promissory estoppel is expectation damages); *Chester Creek Technologies, Inc. v. Kessler*, 2007 WL 3589, at *4-5 (Minn. App. Jan. 2, 2007) (stating that expectation damages are an appropriate measure of damages for a promissory estoppel claim); *Jackson v. Morse*, 871 A.2d 47, 52 (N.H. 2005) (remanding promissory estoppel claim to trial court for reconsideration of damages and giving judge discretion to award

(continued...)

2.     *Indiana Law*

As noted above, Indiana has adopted § 90 of the Restatement (Second) of Contracts with regard to promissory estoppel claims based on detrimental reliance.  *First National Bank of Logansport*, 577 N.E.2d at 954.  Indiana courts have not stated a general rule for what measures of damages are available for claims based on detrimental reliance.  Instead, Indiana courts have thus far left the question of remedies for tailoring to the particular circumstances of the case.

Many of the cases discussing detrimental reliance under Indiana law involve promises of at-will employment.  In those cases, Indiana courts have repeatedly made it clear that a plaintiff who relied on a promise that would have secured new at-will employment can recover only reliance damages, which may include moving expenses as well as lost salary and benefits from the job the plaintiff left in reliance on the new employment but do not include lost salary that the plaintiff would have earned if the new employment had come to fruition.  *Peters v. Gilead Sciences, Inc.*, — F.3d —, 2008 WL 2719579, at *5 (7th Cir. July 14, 2008) (applying Indiana law); *Jarboe v. Landmark Community Newspapers*, 644 N.E.2d 118, 122 (Ind. 1994); *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 895 (Ind. App.

---

[8](...continued)

expectation damages or reliance damages); *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800, at *36 (Ohio App. Sept. 21, 2005) (stating that possible remedies for promissory estoppel are reliance and expectation damages); *Tynan v. JBVBB, LLC*, 743 N.W.2d 730, 735 (Wis. App. 2007) (affirming trial court's decision to award reliance damages but recognizing that trial court had stated that it had discretion to award either expectation or reliance damages).

2007).  In effect, these cases teach that promissory estoppel cannot be used to convert at-will employment to employment requiring just cause for discharge. See *McCalment*, 860 N.E.2d at 895.   As the Seventh Circuit has explained: "Because the employer could have terminated the employee without cause at any time after the employment began, the promise of a job brings no expectation of any determinable period of employment or corresponding amount of wages.  The promise is therefore unenforceable under either a contract or a promissory estoppel theory in an action for lost wages." *D & G Stout, Inc. v. Bacardi Imports, Inc.*, 923 F.2d 566, 568 (7th Cir. 1991).

Seventh Circuit decisions point in opposite directions on the availability of expectation damages under Indiana law of promissory estoppel.  *D & G Stout* did not involve a promise for at-will employment, but the Seventh Circuit concluded that Indiana law draws a distinction between reliance damages, which are available for promissory estoppel claims, and expectation damages, which are not available under promissory estoppel.  The plaintiff in *D & G Stout* had turned down a buy-out offer in reliance on a promise from a major supplier that the plaintiff would remain the distributor of its product in a specific geographic region.  The supplier did not keep its promise, and the plaintiff eventually accepted a much lower buy-out offer.  The promisee sought the difference between the two offers as damages based on detrimental reliance.  The district court held as a matter of law that the difference was not compensable, and the Seventh Circuit reversed.  In doing so, the Seventh Circuit wrote that Indiana law limited damages available for

promissory estoppel to reliance damages, relying exclusively on decisions by Indiana courts that had limited the award of damages to reliance damages in the context of promises for at-will employment. *D & G Stout*, 923 F.2d at 569, citing *Pepsi-Cola General Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 698 (Ind. App. 1982), *Eby v. York-Division, Borg-Warner*, 455 N.E.2d. 623, 627 (Ind. App. 1983), and *Ewing v. Board of Trustees of Pulaski Memorial Hospital*, 486 N.E.2d 1094, 1098 (Ind. App. 1985). The Seventh Circuit proceeded to apply Indiana's rule regarding damages available for promissory estoppel in the at-will employment context to the somewhat similar claim that was before it, concluding that the devaluation of the company after the promise was breached was a reliance injury compensable under promissory estoppel.

Ten years earlier, the Seventh Circuit had rejected an appellant's argument that reliance damages were the only appropriate measure of damages for promissory estoppel under Indiana law, and affirmed a district court's award that included expected profits from a business transaction. *Walters v. Marathon Oil Co.*, 642 F.2d 1098, 1100 (7th Cir. 1981) ("Since promissory estoppel is an equitable matter, the trial court has broad power in its choice of a remedy, and it is significant that the ancient maxim that 'equity will not suffer a wrong to be without a remedy' has long been the law in the State of Indiana."). The *D & G Stout* court did not discuss *Walters*, nor did it address the statement in § 90 of the Restatement (Second) of Contracts that full-scale enforcement by normal remedies is often appropriate for promissory estoppel claims.

If Indiana law were to apply to this case, this court's role would be to predict how the Indiana Supreme Court would decide the issue of the available damages. This court would predict that the Indiana Supreme Court would not extend the reliance damages rule developed in employment-at-will cases to all types of cases, but would follow the general principle in Restatement (Second) of Contracts § 90 that the remedy "may be limited as justice requires."

Even if a plaintiff could recover only reliance damages under Indiana law, reliance damages can include costs that the plaintiff incurred in order to position himself for his new employment, including moving expenses and lost wages from his previous job.  *D & G Stout*, 923 F.2d at 569.  This court explained in *Frey v. Workhorse Custom Chassis, LLC*, 2007 WL 1021448, at *1-2 (S.D. Ind. Apr. 2, 2007), that opportunity costs that a plaintiff incurred to position himself for a new job, including lost benefits from a previous job, were recoverable under Indiana law based on a promissory estoppel claim.

Under either federal common law or Indiana law, the damages the jury awarded here were not improper.  General Motors promised the plaintiffs that if they accepted supervisory positions, they could transfer back to hourly positions at any time.  Perhaps fearing that the terms of each promise were not sufficiently definite or that the promises had not satisfied the requirements of the statute of frauds, the plaintiffs pursued claims for promissory estoppel in this case despite the evidence of all of the elements of a binding contract.  As the Seventh Circuit

made clear in *Garwood Packaging*, the fact that this claim was for promissory estoppel and not breach of contract does not limit the measure of damages to reliance damages under federal law.   Even if Indiana law were interpreted as limiting damages to reliance damages in this case, the plaintiffs would be entitled to all opportunity costs, including the secure wages and benefits they had in their hourly union jobs and gave up in reliance on the promise.   See *Frey*, 2007 WL 1021448, at *1-2 (denying new trial after jury awarded damages for promissory estoppel claim based on salary and benefits that plaintiff gave up to accept new job).

> 3.        *The Instruction Given to the Jury*

The court instructed the jury:

> If you find in favor of a plaintiff on his/her claim of promissory estoppel, you must decide on an amount of money to award him/her as damages. On this claim, you must compare an individual plaintiff's actual financial experience (income, benefits, etc.) after taking the salaried, supervisory position, with what the evidence shows that individual would have experienced if the promise had not been broken, that is, if the plaintiff had been allowed to return to an hourly position at the time of or shortly after a request to return shortly before the sale of the Allison Gas Turbine Division.

Jury Instruction No. 17.   While the use of the phrase "would have experienced if the promise had not been broken" is language that calls to mind expectation damages, in this case expectation and reliance damages are very similar.   The promise here was that the plaintiffs could return to their previous jobs at any

time; the expectation of returning to the position one held before the promise was made is very similar to never having relied on the promise in the first place.  If the promise had not been broken, the plaintiffs would have been permitted to return to their hourly, unionized jobs and would have received the wages, pension, and healthcare benefits provided through the collective bargaining agreements.  These would have been the same wages, pension, and healthcare benefits that they had before they left unionized workforce in reliance on the defendant's promise, as adjusted over time over the course of several collective bargaining agreements.

The defendant's proposed jury instructions included the following instruction for damages:

> If you find in favor of any of the plaintiffs on his or her claim of promissory estoppel, you must decide on an amount of money to award him or her as damages.  On this claim, you may not award any plaintiff what he would [have] received if General Motors had kept its promise.  Instead, you may award damages only for expenses or losses that the plaintiff suffered because he relied on the promise, and that were not otherwise paid for.  Such expenses or losses may include the value of benefits or compensation that a particular plaintiff was reasonably certain to receive if he or she had not relied on the promise by General Motors.  In other words, any award of damages should put the particular plaintiff in the financial position that he would have been if the promise had never been made in the first place.

Docket No. 157 at 18.  The defendant thus recognized that a proper measure of damages for promissory estoppel included the value of benefits or compensation that the plaintiffs were reasonably certain to receive if they had remained in their hourly positions.

All of the plaintiffs' damages experts explained that they determined the value of the benefits each plaintiff would have received if they had been allowed to transfer back to hourly employment status and compared them with the benefits that each plaintiff actually received as a salaried employee and would continue to receive throughout retirement.  Andrew Smith, a pension actuary, calculated the damages for each plaintiff based on lost retirement benefits.  He testified:  "I determined the retirement benefits each individual plaintiff would have gotten had they been allowed to go back to the hourly employment status and placed a value on those benefits.  Then I determined the retirement benefits that they're actually going to be entitled to from Allison/Rolls-Royce, their subsequent employer, and assigned a value to that.  The damages are simply the differences between those two values."  III Tr. 527.  Similarly, Katherine Garrity testified that in calculating the damages based on medical benefits, she compared the benefits the plaintiffs would have received as hourly General Motors employees and the medical benefits they have received and will receive based on their employment with Allison Engine Company and Rolls-Royce.  IV Tr. 740.  Finally, David Bart calculated the damages to the plaintiffs with respect to wages by comparing the base pay the plaintiffs received as salaried employees to the cash compensation they would have received if they had remained hourly employees.  IV Tr. 805.  Thus, each expert offset the benefits that the plaintiffs actually received from Allison Engine Company and Rolls-Royce from the amount that they would have received if they had been members of the bargaining unit at General Motors.

Rule 51(d)(1) of the Federal Rules of Civil Procedure states that a party may assign as error an error in an instruction the court gave if that party properly objected.   Rule 51(d)(2) states that a court may consider whether any error constituted plain error even in the absence of a proper objection if the error affects substantial rights.  See *Higbee v. Sentry Insurance Co.*, 440 F.3d 408, 409 (7th Cir. 2006).   The defendant did not object to the court's proposed jury instruction before the jury was instructed.  Thus, even if the court's instruction was an error, the court could consider the defendant's argument at this time only if the error affected substantial rights.  General Motors has not shown such an effect.  It did not offer any alternative calculations of its own.

Any difference between the calculation of expectation damages and reliance damages would not affect substantial rights of either party in this case.   The experts testified that each plaintiff had incurred significant damages.   Whether one characterizes these damages as expectation damages or reliance damages, these are proper damages to award for a promissory estoppel claim.

B.    *Evidence of Damages*

General Motors also argues that the court should vacate the damage awards because the evidence of damages was too speculative.  There must be an adequate basis in the record for an award of damages, but it is not necessary for the evidence to show the amount of damages with absolute certainty or precision.

*Trustmark Insurance Co. v. General & Cologne Life Re*, 424 F.3d 542, 552 (7th Cir. 2005); see also *Palmer v. Connecticut Railway & Lighting Co.*, 311 U.S. 544, 561 (1941) ("Certainty as to the amount [of damages] goes no further than to require a basis for a reasoned conclusion."). In some situations, a best estimate of the damages is sufficient. *Trustmark Insurance*, 424 F.3d at 552. Proof of the amount of damages can be circumstantial, "even to the point of estimates based upon assumptions, provided that the assumptions rest upon an adequate base." *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 879 (7th Cir. 1970), citing *Herman Schwabe, Inc., v. United States Shoe Machine Corp.*, 297 F.2d 906 (2d Cir. 1962); see also *SNA Nut Co. v. The Haagen-Dazs Co.*, 302 F.3d 725, 733 (7th Cir. 2002) (stating that certainty of amount of damages requires only a basis for a reasoned conclusion).

Defendant cites *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990) as an example of the Seventh Circuit reversing an award for damages as highly speculative. The case is readily distinguishable. In *Hybert*, the plaintiff had sued his former employer for wrongful discharge in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* After a trial, the jury returned a verdict in favor of the plaintiff and awarded him $150,000 in compensatory damages as well as $20,000 in "liquidated damages" for violating the ADEA willfully. In addition, the district court ruled that reinstatement was not an appropriate remedy and instead awarded front pay of almost $190,000. The Seventh Circuit held that a district court may award front pay for a violation of the

ADEA, but found that the district court had not considered adequately all of the necessary factors in determining the amount of front pay.  The district court had not considered the fact that the plaintiff was awarded liquidated damages.  The Seventh Circuit also stated that a combination of front pay with liquidated damages is less appropriate when the front pay is highly speculative due to the lengthy period for which damages are sought and a lack of certainty as to whether the plaintiff would have remained employed during that long period of time.  *Id.* at 1056.   The court criticized the district court for assuming that the plaintiff would have continued to work until age 72, despite no evidence in the record on this point, and also for assuming that he would have remained at his last-held salary until age 72, despite evidence of performance-related problems.  *Id.* at 1056-57.  The Seventh Circuit vacated the front pay award and remanded the case to the district court for reconsideration.

The situation in *Hybert* is markedly different from this case.  Any front pay award in *Hybert* was in addition to the amount awarded by the jury and depended in part on whether the district court believed that plaintiff had been made whole by the combined award of compensatory and liquidated damages.  The Seventh Circuit's finding that the front pay award was highly speculative was based in part on the fact that the jury had also awarded liquidated damages.  Here, the plaintiffs did not assert claims that permit liquidated damages or front pay.  The entirety of the damages they sought was the difference between the salaries and benefits they received as supervisors and the wages and benefits they would have received

if they had been permitted to return to hourly, unionized positions.  In addition, there was also no evidence here that the plaintiffs had performance-related problems that might have affected their ability to work in the bargaining unit until retirement.

Finally, in *Hybert*, the  matter of front pay was an issue for the district court judge, not the jury, to decide.   Here, the jury was charged with determining whether to award damages and whether the plaintiffs had proven damages with sufficient certainty.   The court instructed the jury that damages could not be entirely speculative: "The plaintiffs are not required to prove their damages with mathematical precision, but you may not award damages based on guesswork or speculation.   Overall, in determining any amount of damages to award on this claim, your task is to award an amount needed to do justice for both sides."  Jury Instruction No. 17.  The court presumes that the jury followed this instruction. *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008), citing *Chlopek v. Federal Insurance Co.*, 499 F.3d 692, 702 (7th Cir. 2007).   The court turns to General Motors' more specific arguments.

### 1.    *Plaintiffs' Ability to Transfer to Hourly Positions*

General Motors argues that the damages were highly speculative here because it was not clear that the plaintiffs Crawley and Hamilton would have been able to transfer to a position in General Motors if they had been permitted to

return to hourly employment.  Wilson Burns, former Executive Vice President of Product Assurance, Purchasing, and Assembly at the Allison plant, testified that immediately following the sale, Allison Engine Company had an excess of supervisors.  Some salaried employees were transferred back to hourly status at that time. II Tr. 164; see also Ex. 18 (list of 35 people who were transferred from supervisory positions to hourly status on Jan. 3, 1994).  General Motors approved these transfers but told Allison Engine Company management that no other supervisors could go back to hourly positions, apparently because there were questions about whether employees who were not part of the hourly workforce on the date of the sale would have rights under the Memorandum of Understanding that General Motors was still negotiating with the UAW after the sale.

Burns testified that 489 hourly employees were furloughed at the time of the sale, which meant that they were being paid but were not working.  Allison Engine Company elected to furlough employees with the least amount of seniority.  Any hourly employees who remained had a right to apply for an opening at General Motors.  Burns testified that during the period in which hourly employees were permitted to apply to transfer to other General Motors plants, hundreds of people took advantage of the opportunity to transfer.  As spots opened up in Allison Engine Company, the people who had been furloughed were able to step back into those positions.  "[W]e had to work with the central office personnel to see where the openings were; and we processed hundreds of people in the first several – first few months after the new company was formed that left Allison Engine and

returned to what at that time was other GM divisions.  And it didn't take very long that we had all the furloughed people back in the factory and a lot of the more senior people had left."  II Tr. 171-72.

Burns' testimony indicates that hundreds of hourly employees were able to transfer from hourly jobs at Allison Engine Company to hourly jobs at General Motors in a period of a few months immediately following the sale.  It was not impermissibly speculative for the plaintiffs' experts to assume that plaintiffs would have been able to transfer to hourly jobs at General Motors if General Motors had kept its promises.

2.    *Plaintiffs' Ability to Remain in the Hourly Workforce*

General Motors also argues that even if it had allowed the plaintiffs to return to the hourly workforce, it is not certain that General Motors would have continued to employ each plaintiff until he or she retired.  Arthur Schwartz, General Motors' General Director of Labor Relations, testified that General Motors reduced its hourly employee workforce by nearly 70% from 1994 to 2007.  See Ex. 131.

The uncertainty about whether the plaintiffs would have been able to keep their jobs at General Motors until retirement was created by the defendant's refusal to allow them to transfer back to the hourly workforce in 1993, when they

wanted to do so.   In *Story Parchment Co. v. Paterson Parchment Paper Co.*, the

Supreme Court stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of
> the amount of damages with certainty, it would be a perversion of
> fundamental principles of justice to deny all relief to the injured person, and
> thereby relieve the wrongdoer from making any amend for his acts.  In such
> case, while the damages may not be determined by mere speculation or
> guess, it will be enough if the evidence show the extent of the damages as
> a matter of just and reasonable inference, although the result be only
> approximate.  The wrongdoer is not entitled to complain that they cannot
> be measured with the exactness and precision that would be possible if the
> case, which he alone is responsible for making, were otherwise.

282 U.S. 555, 563 (1931).  Similarly, the Seventh Circuit explained in *Mid-America*

*Tablewares, Inc. v. Mogi Trading Co., Ltd.*, "where the defendant's wrong has

caused the difficulty of proof of damages, he cannot complain of the resulting

uncertainty."   100 F.3d 1353, 1365 (7th Cir. 1996), quoting Charles T.

McCormick, McCormick Handbook on Damages § 27 at 101.  General Motors

correctly points out that it is impossible to know with complete certainty whether

it would have continued to employ the plaintiffs as hourly employees until they

had reached 30 years of service, but General Motors cannot use the uncertainty

that it created by failing to keep its promises as a shield against liability.

The plaintiffs presented evidence that they each had a record of superior

performance.   Their performance had led General Motors to select them for

supervisory positions in the first place.  Each had worked for General Motors for

a significant period of time.  Plaintiff Crawley had 16 years of service at General

Motors, which was the least amount of service of any of these five plaintiffs. Schwartz testified about the general fluctuations in the size of General Motors' hourly workforce, but stated that he did not have any knowledge about the seniority rights of the plaintiffs or how they would have fared in retaining their jobs at General Motors if they had been permitted to transfer back to the hourly workforce.

The jury heard the testimony from the plaintiffs' expert witnesses about the assumptions they had made that the plaintiffs would have been able to work until retirement in the General Motors hourly workforce in reaching their conclusions about the amount of damages. General Motors could challenge those assumptions with cross-examination and contrary evidence. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). The jury also heard Schwartz's testimony about the reduction of the size of the General Motors hourly workforce in the Indianapolis area during the relevant time period. The jury weighed this evidence and determined that the plaintiffs were entitled to damages, though less than the plaintiffs' experts had calculated. The jury was cautioned against speculation and used its collective judgment to reach a just result. The court sees no reason to disturb the jury's verdict.

3.    *Wage Differential*

Finally, General Motors argues that David Bart speculated about the amount of damages the plaintiffs incurred based on the salaries they earned as

supervisors compared to the wages they would have earned as hourly employees. Instead of using the plaintiffs' W-2 forms to determine the amount of wages each plaintiff had actually earned as a salaried employee, Bart used a generic "base rate" that was published in the company's documents.   In addition, defendant argues that Bart erred by comparing the base salary of each salaried employee to the average base hourly rate plus 600 hours of hourly-wage overtime per year when calculating the damages.   The plaintiffs argue that this comparison was proper because the plaintiffs testified that they worked at least 600 hours of "casual overtime" each year, for which they were paid only their base salaries.

Whether Bart's methodology was flawed is not a legal issue but a factual one specific to the practices and compensation in the Allison Engine division.   Whether and to what extent the plaintiffs had incurred damages based on the salaries they received were questions for the jury to answer.   General Motors' counsel cross-examined Bart vigorously about his use of the generic base rate instead of the W-2 forms and his comparison of base salary to average base hourly rate plus 600 hours of overtime.   Defendant's counsel also addressed Bart's methodology in his closing argument.   General Motors also had the opportunity to present evidence of its own about the proper amount of damages with respect to wages, but chose to rely on poking holes in Bart's methodology.   The court agrees that the criticism was justified to at least some degree, and after hearing all of the evidence, the jury

awarded plaintiffs less than they had requested.[9]   General Motors did not challenge the methodology or proposed damage awards that the experts on medical benefits or pension benefits presented.  It stands to reason that the jury's damage awards took into account these arguable flaws with Bart's methodology by discounting plaintiffs' requests to some degree.  The court finds no reason to disturb the jury's verdicts based on Bart's testimony.


IV.    *Closing Argument*

        Finally, General Motors argues that it is entitled to a new trial because plaintiffs' counsel made numerous inappropriate statements during closing argument that prejudiced the jury against the defendant.   General Motors contends that plaintiffs' counsel (a) attempted to elicit local bias by referring repeatedly to the facts that he and the plaintiffs lived in Indiana and the defendant's headquarters and attorneys were located in Michigan; (b) made repeated references to the relative wealth of the defendant and the modest circumstances of the plaintiffs; and (c) blamed the defendant for the decline of the American automobile industry and insinuated that General Motors executives believed they could take advantage of "Hoosiers."  The court finds no basis for a

---

[9]Plaintiff Kappel requested $565,860 and the jury awarded him $548,935. Plaintiff Stuart requested $510,357 and the jury awarded her $383,118.  Plaintiff Crawley requested $898,870 and the jury awarded her $705,968.   Plaintiff Hamilton requested $962,361 and the jury awarded him $815,402.   Plaintiff Livengood requested $677,537 and the jury awarded him $651,838.

new trial here.  General Motors did not object to any of these statements when the court could have sustained objections and given corrective instructions.

Statements designed to elicit local bias are improper.  *Cole v. Bertsch Vending Co.*, 766 F.2d 327, 333 (7th Cir. 1985).  Plaintiffs' counsel made many references in his closing argument to executives from General Motors making decisions in Detroit that affected the plaintiffs in Indiana.  Plaintiffs' counsel also repeatedly made reference to General Motors closing American plants and opening plants in China and Mexico.

General Motors' counsel did not object to any of these statements.  Instead, he responded to suggestions of local bias in his closing argument:  "I represent General Motors and, yes, the headquarters are in Detroit.  They always have been.  It's the auto capital of the world.  That doesn't mean we were not residents of Indiana.  We have [a] stamping plant here.  We had Allison.  We had a plant in Muncie.  We had Anderson."  V Tr. 963.

Appealing to the sympathy of jurors through references to the wealth of defendants and comparative poverty of plaintiffs is also improper.  *Adams Laboratories, Inc. v. Jacobs Engineering Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985).  "If the wealth and size of a corporation are not at issue, counsel is bound to refrain from making reference to such size and wealth, or bear the risk of an unfavorable appellate reception."  *Id.*  Plaintiffs' counsel referred to General Motors

having made seven billion dollars in profit over the last few years.  General Motors had stipulated to the admissibility of Exhibit 29, which lists the net income of General Motors for each of the years between 1991 and 2006.  Richard O'Brien, former vice president of corporate personnel at General Motors, had testified about the financial difficulties of General Motors during this time period and the consequent reduction in the size of its workforce.  O'Brien thus made an issue of the wealth and size of General Motors.  It was not inappropriate for plaintiffs' counsel to refer to this data, which was relevant to both compensatory damages (because General Motors tried to show plaintiffs' employment would have been so insecure) and punitive damages.

Plaintiffs' counsel developed a theme that General Motors has a history of deception.  He argued that General Motors deceived its employees when it promised them they would be able to transfer back to the hourly workforce at any time.  He painted a picture of sun-tanned General Motors executives (one key witness for General Motors had retired to Florida) repeatedly taking advantage of less-educated line supervisors from Indiana.  He referred to General Motors trying to sell the jury a Corvair by arguing that its policy was that a supervisor had a right to transfer back to the hourly workforce only in the event of a reduction in force, which had been General Motors' management's effort to limit the much broader (and more valuable) promises it had made to these plaintiffs and others.

Defendant's counsel did not object to any of these statements that General Motors now contends denied it a fair trial. Instead, he began his closing argument by attacking plaintiffs' counsel's improper appeals and trying to take the moral high ground to strengthen his own credibility with the jury:

> Obviously corporate bashing is alive and well, the – by lawyers representing clients who paint these companies that employs lots of people, pay lots of benefits, provides lots of jobs, paints them with a brush that often, you know, couches sarcasm at their bosses they sell people, they don't care. You know it's somewhat interesting that this lawsuit is about the benefits that this company pays to its employees, that's what the lawsuit's about, and yet we're the bad company that doesn't care; that tries to pull the wool over a jury's eyes by selling a Corvair, et cetera, et cetera. I'm going to dispense with the sarcasm. I stood here a week – Monday of last week and said I'm going to give it to you as straight as I can. I tried to do that. I'm going to try and do it now.

V Tr. 962-63.

At the beginning of the rebuttal portion of closing argument, plaintiffs' counsel described defense counsel's effort to be straight with the jury as ironic, given the evidence that General Motors' executives had not been straight with the plaintiffs. Plaintiffs' counsel stated, in a mocking tone meant to impersonate a General Motors representative: "Well, just don't worry your head about that, you Hoosiers, don't worry about that." V Tr. 988. At that point, when General Motors no longer had an opportunity to respond further, the court interrupted plaintiffs' counsel and asked him to approach the bench. The court quietly warned: "If I hear anything more about "Hoosiers," "Corvair," [or Marion County prosecutor] Carl Brizzi," I'm going to come down very hard even without an objection; is that

clear?" V Tr. 988.  Plaintiffs' counsel did not use any of these terms again during his closing argument.  The remainder was sharp but did not repeat the improper comments from the initial portion of the argument.

A party seeking a new trial based on improper comments during closing argument has a heavy burden.  *Doe v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995).  "[I]mproper comments during closing argument rarely rise to the level of reversible error."  *Id.*, quoting *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989). Improper arguments during closing argument warrant reversal only if they substantially prejudiced the jury against the opposing party.  *Arcor, Inc. v. Textron, Inc.*, 960 F.2d 710, 713 (7th Cir. 1992).  It is not clear that the statements by plaintiffs' counsel substantially prejudiced the jury against the defendant.  Even in the absence of the statements by plaintiffs' counsel, it is unlikely that members of the jury would not already have known that General Motors was a large corporation or that its headquarters were located in Detroit.  Also, the jury found that the defendant was not liable for fraud and awarded no punitive damages. Though the jury found the defendant liable for the promissory estoppel claims, it awarded a smaller amount of damages to each plaintiff than plaintiffs' counsel had requested.

Some of the statements of plaintiffs' counsel were inappropriate, but General Motors waived any possible arguments by failing to object when the statements were made, when the court could have taken strong and immediate

corrective action.  The failure to object to statements during closing argument in a civil case waives any argument as to the statements on appellate review.  *E.g.*, *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008); *Sheldon v. Munford, Inc.*, 950 F.2d 403, 410-11 (7th Cir. 1991) (finding comments by plaintiff's counsel about defendant's wealth unprofessional but affirming district court's denial of motion for new trial on this ground because defendant's counsel did not object).

The primary reason that opposing counsel must object at the time of the statement is that it gives the court the ability to rule on the objection and to provide a curative instruction to the jury if necessary.  *Gonzalez v. Volvo of America Corp.*, 734 F.2d 1221, 1229 (7th Cir. 1984) (Cudahy, J., dissenting), vacated *en banc* on this point, 752 F.2d 295, 298 (7th Cir. 1985) (new panel opinion).  This court has done so more than a few times during inappropriate closing arguments.  Here, the court provided a standard general instruction to the jury that statements by the attorneys in arguments do not constitute evidence. Jury Instruction No. 5.  The court also instructed the jury that all parties, including corporations and individual people, stand equal before the law and that the jury should decide the case as an action between parties of equal worth.  Jury Instruction No. 3.  The court presumes that the jury obeyed these instruction. See *Soltys*, 520 F.3d at 745.  However, the defendant did not ask for and the court did not provide a more specific instruction to the jury identifying the inappropriate appeals in the closing argument and cautioning the jury to disregard them.

The only case the defendant has cited in which a court granted a new trial based in part on statements made by counsel during closing argument despite the fact that opposing counsel did not object to the statements at the time is *Cole v. Bertsch Vending Co.*, 766 F.2d 327 (7th Cir. 1985), which is readily distinguishable and has been superseded by later cases on this point.  In *Cole* case, the plaintiff sought a new trial in part because of comments defense counsel made during closing statement that plaintiffs' witnesses were from Ohio while the jurors were from a part of Indiana that was competing actively with a neighboring town in Ohio for an employment contract.  *Id.* at 333.  Plaintiff's counsel failed to object to the potentially prejudicial comments when they were made.  During the trial, a key witness had a heart attack on the stand while he was being cross-examined, and a juror had an alcohol-related seizure during deliberations.  *Id.* at 330.  The court also found that the district court had erred in excluding certain evidence.  *Id.* at 333.  Despite the failure to object to the statements during closing argument, the court found that the attempt to elicit local bias combined with the other significant prejudicial occurrences and their possible effect on the jury justified a new trial. *Id.* at 333-34.[10]  Here, General Motors has not identified any potentially prejudicial occurrences other than statements by plaintiffs' counsel.

---

[10]The court analyzed whether statements by defendant's counsel constituted plain error that would have required a new trial and determined that they did not. *Cole*, 766 F.2d at 333.  Since then, the Seventh Circuit has held that a party cannot use the plain error doctrine to remedy errors that occurred during closing argument in a civil trial.  *Deppe v. Tripp*, 863 F.2d 1356, 1364 (7th Cir. 1988).

General Motors' counsel has explained that he did not object to the statements at the time they were made because he was concerned about creating an unfavorable impression with the jury. "[N]either trial tactics nor mere temerity will excuse counsel's failure to object to a remark made in closing argument." *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 704 (7th Cir. 1992) (citations omitted).[11] In *Gonzalez v. Volvo of America Corp.*, 752 F.2d at 298, the defendant waited until after the jury returned its verdict to complain about statements by plaintiffs' counsel during closing argument. The Seventh Circuit stated:

> defendant-appellant waited until the jury had returned an unfavorable verdict to complain to the trial court that plaintiffs' closing argument had been improper. Perhaps defendant-appellant feared that a contemporaneous objection would incur hostility from the jury. This court need not speculate as to the nature of defendant-appellant's motives. Suffice it to note, however, that risky gambling tactics such as this are usually binding on the gambler.

*Id.*; see also *United States v. Socony-Vacuum Oil, Co.*, 310 U.S. 150, 238-39 (1940) (counsel "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial").

Defendant's counsel made a calculated decision not to make any objections during plaintiffs' counsel's closing argument. Rather than seeking the court's

---

[11]By quoting this passage, the court does not mean to suggest that General Motors' attorney Page exhibited any "temerity." He is an excellent trial lawyer who made reasonable tactical decisions in a case in which the evidence weighed heavily against his client.

help, he chose to address on his own the inappropriate appeals by plaintiffs' counsel.  Especially in the hands of such a fine attorney, that can be an effective response to inappropriate appeals, and perhaps much more effective than asking the court to intervene.  Having chosen that response, General Motors waived any arguments about any prejudicial effects plaintiffs' counsel's statements might have had on the jury.  No new trial is warranted on this basis.

*Conclusion*

The court denies the defendant's motion to strike the plaintiffs' demand for a jury.  The court denies the defendant's motion for judgment as a matter of law. The court also denies the defendant's motion for a new trial.  The court will confer with counsel in the near future to discuss preparations for the next trial.

So ordered.

Date: August 15, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kevin W. Betz
BETZ & ASSOCIATES
kbetz@betzadvocates.com,litigation@kbetzlaw.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com,litigation@betzadvocates.com

David Matthew Davis
HARDY LEWIS & PAGE PC
dmd@hardylewis.com

Terence V. Page
HARDY LEWIS & PAGE, P.C.
tvp@hardylewis.com,dmr@hardylewis.com

Robert Anthony Prather
BARNES & THORNBURG LLP
tony.prather@btlaw.com